*Albert V. Taylor,* for defendant in error.

---

### ORDINANCES ESTABLISHING STREET RAILWAYS.

[Circuit Court of Cuyahoga County.]

WM. M. RAYNOLDS, A TAX-PAYER, ON BEHALF OF CLEVELAND, V. CLEVELAND ET AL.

Decided, June 21, 1902.

*Street Railways—Ordinances Establishing—Municipal Authority Limited—Ordinance Must Cover the Same Route Designated in the Advertisement for Bids—Provision for Arbitration Between Company and Its Employes Invalid—Motive of Tax-payer Bringing Suit to Enjoin Immaterial.*

1. Authority upon the part of a municipality to regulate and control the construction and operation of street railways is obtained only from statutes expressly conferring such power, and is subject to all the limitations therein embodied.
2. Section 2501 definitely prescribes what shall be done in an establishing ordinance and Section 2502 the conditions under which a grant may be made, and where there has been an advertisement for bids to construct a designated route at the lowest rate of fare, the

municipality can not thereafter grant the right to construct a street railway upon a part only of such designated route, nor can the municipality, without publishing notice of and receiving further bids, make a grant for a route which includes a street not embraced in the route as originally designated.

3. There is no requirement in the statute, providing for the bringing of a suit by a tax-payer to enjoin certain corporate acts, that he shall be free from a personal motive; and a complaint in such a suit as the one at bar, that the plaintiff is not sincere in his action for the protection of the public, but is in fact acting for the benefit of other street car lines, will be disregarded.

4. A provision in an establishing ordinance, that differences between the company receiving the grant and its employes shall be settled by arbitration, is invalid, in that it is a restraint upon bidding and likely to increase the rate of fare.

CALDWELL, J.; HALE, J., and MARVIN, J., concur.

Appeal by plaintiff.

Wm. M. Raynolds, as a tax-payer on behalf of the city of Cleveland, after making application to the corporation counsel to bring this action which he refused to do, brings this action on behalf of himself, and says that he is a resident and a tax-payer of the said city; that the defendant, the city of Cleveland, is a municipal corporation under the laws of Ohio, and is a city of the second grade, first class; that Tom L. Johnson is the duly qualified and acting mayor of said city; that said Johnson, together with the defendants, Harris R. Cooley, Charles P. Salen, Charles W. Lapp, James P. Madigan, John Dunn and W. M. Beacom are the duly and legally constituted board of control of said city; and that The People's Street Railway Company is a corporation organized and existing under the laws of the state of Ohio. And then he sets up his request served upon the city solicitor to bring this action, and the refusal of the city solicitor to do so and his failure to comply with the request. He states that on January 6, 1902, a certain ordinance, known as ordinance No. 35,897-a, and referred to hereinafter as the "establishing ordinance," was passed by the council of the city of Cleveland to establish street railway routes, to provide for granting of a franchise to construct and operate a street railroad thereon, and specifying the manner whereby such franchise should be granted to

the party offering to charge the lowest rates of fare under competitive bidding therefor, and prescribing the terms and conditions under which said street railroad should be constructed and operated; that said ordinance was approved by the mayor of said city on January 7, 1902, and was thereafter published as required by law, and took effect and became in force on January 18, 1902. And then he sets out the "establishing ordinance" in full, and the caption to the same is:

"An ordinance to establish street railroad routes, to provide for granting a franchise to construct and operate a street railroad thereover, and specifying the manner whereby said franchise shall be granted to the party offering to charge the lowest rates of fare under competitive bidding therefor; and to prescribe the terms and conditions under which said street railroad shall be constructed and operated."

Then the ordinance provides to establish seventeen different routes, all within the city of Cleveland.

Section 2 provides for advertising for three consecutive weeks for sealed proposals, to be received at the office of the board of control, on the fourth Monday after this ordinance takes effect, to construct and operate a street railroad over the routes as established in Section 1 hereof; and each and all bids for such street railroad franchise so proposed to be granted shall be under and subject to the terms and conditions specified in the following sections of this ordinance.

Section 3 provides for the form and words of the bid, and the form is for the bid on a street railroad on routes as the same are described in Section 1 of the ordinance, as well as other matters, and the rates of fare proposed to be charged, and requires that, accompanying the bid, there shall be $50,000 put up in money, to be forfeited, under the conditions of said ordinance, if the same are not complied with.

Section 4 requires that each bid shall be accompanied by $50,000 in United States notes, national bank notes, or gold or silver certificates, to insure the performance of the contract. And the same section provides that the money accompanying the bid declared to be the lowest and accepted by the city shall be retained and become the property of the city as liquidated

damages against said lowest bidder, upon the following conditions: "Said money shall be so retained as liquidated damages upon the failure of said lowest bidder, within ten days after being declared such lowest bidder, to request in writing from the council and the board of control of the city of Cleveland permission to construct and operate a street railroad over the routes defined in this ordinance." And that, "Said money shall be retained as liquidated damages as aforesaid upon the failure of said lowest bidder, within ten days after the passage and legal publication of the ordinance granting permission to construct said six miles of double track, to accept in writing the terms and conditions of said grant." And, "Said money shall be retained as liquidated damages as aforesaid upon the failure of said lowest bidder within six months after the passage and legal publication of the ordinance making said first grant as above specified, to have constructed at least six miles of double track of said street railroad. On completion within the time specified, of said six miles of double track, said money shall be returned to said lowest bidder."

Section 5 provides: "The board of control shall report all bids to the council with a recommendation as to which is the lowest bidder, and the moneys of all other bidders shall be returned to their respective owners immediately after such recommendation."

Section 6 provides: "The party whose bid is accepted by the city, within ten days after the date of being declared the lowest bidder, shall request in writing from the council and the board of control of the city of Cleveland permission to construct and operate a street railroad over the routes defined in this ordinance, and within thirty days after being so declared the lowest bidder said party shall apply in writing for a grant to construct at least six miles of double track and shall furnish the necessary consents of the abutting property owners to so construct said six miles of double track within said thirty days. Said party shall accept in writing the terms and conditions of the ordinance making said grant, within ten days after the passage and legal publication thereof, and the said six miles of double track shall be constructed within six months after the

date of the grant thereof. The said lowest bidder shall make application within six months after the date of said first grant for permission to construct at least an additional six miles of double track of said street railroad, and shall obtain the necessary consents of the property owners and accept the terms of the ordinance making said grant the same as specified for said first grant. Said lowest bidder shall continue to make such applications to construct at least six miles of double track, at intervals of six months, obtain consents and accept the grants as above specified until permission to construct said entire system has been granted. The board of control shall have the power to extend the time for making said applications and obtaining the necessary consent of abutting property owners, and all parts of track shall be constructed, equipped and operated within one year from the time of the granting of each section, unless prevented by legal proceedings over which said lowest bidder has no control."

Section 7 grants certain privileges as to property owned by the city.

Section 8 gives the right to the party whose bid is declared to be the lowest, to erect the necessary lines of poles and wires to connect the necessary power houses with said railroad system, and wherever the said route or routes provide for a private right of way the party so constructing said railroad shall have the right to construct the necessary curve into said private right of way, and to lay said tracks through and across the intervening streets.

Section 9 provides for the kind of power and machinery for moving the cars upon the route.

Section 10 provides: "The rates of fare for which the bidder proposes to carry passengers shall entitle the passenger to one continuous ride in the same general direction, and each passenger shall be entitled to one transfer ticket for passage to another line, at all points of intersection with other routes, if such transfer be necessary to enable him to continue to his destination." And provides further for certain reservations, of the right of the city to regulate transfers to carry out this provision, and also reserves the right to establish transfer

points, and require the exchange of free transfers at such points between the lines of the proposed grantee hereof and other street railroad companies.

Section 12 provides: ''Whenever the routes are along streets not in 'free territory,' so-called, now occupied by other street railroad tracks, said party so constructing said street railroad shall have the right to construct straddle tracks, the same to be removed whenever the joint right of use is established.''

Section 13 provides that, ''Whenever any controversy arises between the party operating the railroad under the franchise hereby proposed to be granted and its employes which interferes or threatens to interfere with the operation of the road, each side of the controversy shall appoint two persons as its representatives, whose action shall be final.''    And if such board does not agree within three days, then the mayor shall become the fifth member of the board and a majority vote of said board, consisting of five members, shall be final. No motorman or conductor shall work more than ten hours within the limits of fourteen hours in any twenty-four hours, except in case of emergency causing obstruction of traffic.

Section 14 provides for the expiration of the franchise within twenty years from the date of the passage of the ordinance.

Section 15 is: ''The city reserves the right to purchase said street railroad, with any additions or extensions, whenever it may have the power to do so, for such price and upon such terms and conditions as may be agreed upon between it and the owner thereof, or upon their failure to so agree, then for such price and upon such terms as may be fixed by a board of arbitration consisting of three persons, a majority of whom shall decide all questions.''

Section 16 establishes certain regulations by which said board of arbitration is to be governed and the manner of choosing the same.

Section 17 provides for the manner of estimating the value of the property to be taken over to the city.

Section 18 is a reservation of the right on behalf of the city to decline to take the property at the valuation fixed by arbitration, but, in case it does decline, it shall not demand the

purchase_ within a period of two years thereafter; and also provides that, "Whenever, after ten years from the date hereof, the net earnings of said company exceed eight per centum per annum on the actual *bona fide* value of said road, equipment, extension, etc., irrespective of the capitalization thereof, the owner shall pay one-half of said net earnings in excess of eight per cent., whether said earnings are applied to interest payments, dividends, surplus, extensions or betterments, into the city treasury. And for the purpose of ascertaining said value the same procedure shall obtain as provided in Section 17 hereof for purchase."

Section 19 reserves to the city the right to grant a way for other roads over the tracks of this company.

Section 22 provides: "No bids will be considered which provide for a higher rate of fare than three cents. The city reserves the right to reject any or all bids."

The petition further states that, after the publication of such establishing ordinance, the clerk of the city advertised, according to the provisions of the ordinance, for sealed proposals to be received at the office of the clerk of the board of control until twelve o'clock at noon on February 10, 1902, for the right to construct and operate a street railroad over the routes as numbered and described in the establishing ordinance; that John B. Hoefgen bid at a proper time and place, by a sealed proposal in the form provided for in the above-mentioned establishing ordinance; and that, according to his bid, he agreed to construct and operate a railroad on the routes such as are described in Section 1 of the establishing ordinance, and agreed to conform in every particular to the requirements, conditions, provisions, and stipulations as in said ordinance set forth, and as referred to, implied, or indicated by said ordinance, and the rates of fare therein specified; that he was the only bidder, no other proposal being made; and that thereafter the board of control recommended to the council of said city that the said John B. Hoefgen was the lowest bidder and that he was found and declared by the council to so be; and that thereafter, on February 5, 1902, John B. Hoefgen filed an application to the city council and said board of control of said city for permis-

sion to construct and operate a street railroad over the routes referred to in said establishing ordinance; and that on March 24, 1902, an ordinance known as No. 36,624, and which I shall hereinafter refer to as the "granting ordinance," was passed by the council of the city of Cleveland, purporting and attempting, in compliance with the provisions of the establishing ordinance, the advertising for sealed proposals or proposed bids thereunder, and the bid of the said John B. Hoefgen in response to said advertisement, and the acceptance of said bid, to grant to him, the said John B. Hoefgen, the right to construct and operate a street railroad over the routes in said granting ordinance passed March 24, described; and that said granting ordinance was, on March 24, 1902, approved by the mayor, and was by the clerk of the city published for the first time in *The Cleveland Plain Dealer* on March 28, 1902.

It is claimed that the granting ordinance does not conform to the establishing ordinance nor does it conform to the publication made after the passage of the establishing ordinance, and that there are various other conditions which it is unnecessary to notice at this time.

The petition sets up various respects in which the contract made with J. B. Hoefgen on the part of the city is illegal, and, on account of which illegality, it is asked by the plaintiff to have the court enjoin the construction or the carrying out of said contract.  Some of these I will briefly state:

First.   That at the time the establishing ordinance was passed and the proposals advertised for, there was no application by Hoefgen for permission to build a road.

Second.   That Hoefgen made no application to construct a road on Champlain street before the granting ordinance was passed, and no such application was made by any one, nor was such application published for three weeks.

Third.   That there were no proposals, and no bid to construct a railroad over the streets included in the granting ordinance: Superior street from the easterly limits of the city to Rosedale avenue, a distance of about 1,800 feet; Rosedale avenue between Superior street and Wade Park avenue, a distance of about 2,550 feet; Norwood avenue between Wade Park ave-

nue and Bona street, a distance of about 1,425 feet; Bona street between Norwood avenue and Dana street, a distance of about 375 feet; private right of way between Dana street and Lyon street, and crossing the last-named two streets, about 375 feet; East Stanard street between Lyon street and Wilson avenue, about 750 feet; Marquette street between Wilson avenue and Hamilton street, about 900 feet; Hamilton street between Marquette street and Kirtland street, about 1,800 feet; Champlain street between Canal street and Ontario street, about 1,800 feet. These are the distances given in the petition, which are only substantially correct as to some of them, as was shown by the evidence and admitted facts. And it is claimed that as to these parts which are covered by the granting ordinance, there was no proposal and no bidding by Hoefgen.

Fourth. It is claimed that there is a departure in the granting ordinance from the establishing ordinance, as to some 2,025 feet on Rhodes avenue between Denison avenue and Burton street; that this difference consists of whether the tracks of the road shall be used, or whether straddle tracks shall be built.

Fifth. That the bid of Hoefgen was for seventeen routes as required in the establishing ordinance, about seventy miles in length, while the grant is only for a part of these streets and includes other streets not mentioned in the bid, and the grant is for only about eleven miles.

Sixth. That the establishing ordinance, the advertisement for proposals, and the bid of Hoefgen were for all these routes of about seventy miles in length in the aggregate, as a single road and extending to all parts of the city for a single fare, whereas the grant was for only a part; and it is claimed that there was no competitive bidding for the route that was granted. It is claimed that the carrying out of the contract should be enjoined because the bidder was required to put up $50,000 as a guarantee to get consents, and because of the terms by which it was to be forfeited.

Seventh. That the contract was illegal in the provision for the city to purchase the entire road; that the city had no authority, and that this was a provision that would deter bidders, and thwart the purpose of getting a bid at the lowest fare.

It is claimed that the contract is illegal because founded upon compulsory arbitration of disputes with employes, and because of the unreasonable and unwarranted conditions in this feature of the contract, which tended to prevent free, competitive bidding.

Eighth.    That there is a variation in said contract, from the establishing ordinance, as to the right to use other tracks instead of establishing straddle tracks.

After the bid of John B. Hoefgen was accepted he made application as required by the establishing ordinance to build the road; and thereafter, within the time required by the establishing ordinance, he made application to build some thirteen miles of the road, and for which he presented the required consents, and thereupon the ordinance was passed granting him the permission to build that road.    He has not the consents on any other part of the road contemplated in the establishing ordinance, nor does the later ordinance purport to give him any contract rights to build any portion of the seventy-five miles except the thirteen miles above referred to, which thirteen miles is comprehended within three of the routes described in the establishing ordinance.    And complaint is made that this contract awarded him is illegal in the matters above referred to, and especially so as to the matter pertaining to Champlain street.    It is admitted in the case, on behalf of defendants, that there was no application and no publication as to Champlain street.

When the parties were about to make the contract, or prior thereto, it was discovered that consents could not be had over Canal street, and hence no legal contract could be made by the city for the construction of a road over that street, and thereupon, instead of following Canal street from Champlain street to Michigan street and over Michigan street to Seneca street and Seneca street to Champlain street, the route was changed, and the road was continued over Champlain street to Seneca street and did not pass over Canal and Michigan streets; and especially as to the fact that the building of the road under this grant, for some thirteen miles, was never published separate and apart from other routes, was never applied for sepa-

rate and apart from other routes, and was never bid upon as a separate route; and the city has let it as a separate and distinct route without bidding, without application and without advertisement, and in this the spirit, intent and purpose of the law has been so far violated that the carrying out of this contract should be enjoined.

The defendants' counsel in this case have urged upon the court the great public benefit that this road will be to the public in this city, and of its being a step in the direction that will result in good, and that the court should be willing to help to carry out a purpose to benefit the public. While these considerations urged with so much earnestness by counsel appeal to the court with all the force that they should have in a connection of this kind, yet we regard it our paramount duty in consideration of this, as we do in all cases, to determine what the rights of the parties are. These rights resting in contract, and this contract as to its legality being measured by the authority of the city to enter into and to make such a contract, the only consideration that is worthy of our attention in this case is, as to whether the city has complied with the laws defining its duties and rights, and, if it has acted lawfully, its action should be approved. If it has acted beyond its power, or in such a manner as to thwart the purpose and intention of the law of the state pertaining to this matter, then the court should be fleet to say so and enjoin such unlawful acts. So that our only purpose, as it is our duty, in determining this case, is to determine whether the city in making the contract it has made, has proceeded according to law and has carried out the purpose and intent of the law in what it has done.

The streets and highways belong to the state and are under the control of the state, and, in former times, the establishment of a street railroad was usually granted by a special act of the Legislature; but the state has seen fit to place the streets of a city under the control of the city authorities, subject to such regulations and restrictions as the state may see fit to impose. Merely granting to the city power over streets at a time when street railroads were not contemplated would not necessarily give to the city power to regulate and control the building of

street railroads within the streets of the corporation; and, hence, after giving the power to the city to regulate and control and improve and lay out and establish streets, the Legislature, after street railroads became in use, saw fit, in Section 3437, Revised Statutes, to define wherein the municipal corporations of the state may allow street railroads to be constructed, and conferred upon the city the power, in Section 3438, Revised Statutes, to grant authority to construct the same, and has seen fit under Sections 2501 and 2502, Revised Statutes, and other sections in connection therewith, to prescribe terms and conditions upon which the city council can allow such roads to be built, and these are limitations upon the power conferred upon the city council by the former sections, and the power being granted under limitations and conditions attached thereto, the power can be exercised only in accordance with the limitations and conditions as found in the statutes. If *these* have been complied with in the granting of this railroad in the streets, the city has performed its entire duty, and its acts should be approved by the courts; if not complied with it has failed to make a legal contract and the carrying out of the same should be enjoined.

Section 2501, Revised Statutes, provides:

"No corporation, individual or individuals shall perform any work in the construction of a street railroad until application for leave is made to the council in writing, and the council by ordinance shall have granted permission, and prescribed the terms and conditions upon and the manner in which the road shall be constructed and operated, and the streets and alleys which shall be used and occupied therefor, but the council may renew any such grant at its expiration upon such conditions as may be considered conducive to the public interest."

The purpose of this section is to point out what steps are necessary in establishing a road; and it provides that the first step, before anything shall be done, is, that there must be made an application to the council in writing, and the second step is, that the council by ordinance shall grant permission, and, in that ordinance, it shall prescribe the terms and conditions upon, and the manner in which the road shall be constructed

and operated and the streets and alleys which shall be used and occupied therefor.

And we think it is the intention of the statute that upon leave being applied for, the council must, by ordinance, which is the establishing ordinance, map out the streets and alleys and the route that the road is to pursue, and fix in that the terms and conditions and the manner in which the road shall be constructed and operated; and Section 2502, Revised Statutes, provides that none of these things shall be done; there shall be no ordinance nor resolution to define a street railroad allowed except upon the recommendation of a certain board, if the city has that board, and no grant shall be made except to the corporation, individual or individuals that will agree to carry passengers upon such proposed railroads at the lowest rate of fare.

It seems to us, then, that Section 2501, Revised Statutes, definitely fixes what shall be done in or by the establishing ordinance. We do not intend to say that the council *can not* act, by way of making an establishing ordinance, unless some one has applied for leave to build a railroad; but the legislators seem to have taken it for granted that the council *would not* act unless some one desired to build a road; and Section 2502, Revised Statutes, says that no grant shall be made except to the corporation, individual or individuals that will agree to carry passengers upon such proposed road at the lowest rates of fare and shall have previously obtained the written consent of a majority of the property holders upon such street or parts thereof.

The establishing ordinance is a condition precedent, and, that it shall mark out the streets and alleys over which the road shall pass, is imperative, and the publishing thereof required in the same section is imperative, and all *that* must be done before any contract can be made, and before any contract can be made there must be some method adopted of ascertaining the lowest bidder. The only practical way to ascertain the lowest bidder is by calling for bids and sealed proposals and determining it in that manner, and the city did not undertake to determine it in any other way, and that, to our minds,

is the only practical method and the one contemplated by the statute.

In this case the contemplation of the establishing ordinance is but one railroad, although some seventeen different routes are prescribed in the ordinance, yet it is everywhere referred to as *one* road. It was treated by the council in the establishing ordinance as *one* road; it was published as *one* road, and the streets and alleys were defined as being *one* road; it was a unit. There is no suggestion, in the establishing ordinance, of *different roads, but only different routes of one road,* and the whole action of the city, up to the time of the granting of the contract, seems to point to but one road, but, after the publication, the city undertakes to change the route of the road and undertakes to dissect this road into parts, and accepts a bid over all these routes as though made on the one that it let.

It is contended on the part of the defendants that no application is necessary prior to the establishing ordinance; and it is contended that the passage of an establishing ordinance is not necessary and is not required by the statute—that it is a mere voluntary proceeding by the council if done at all and is extra-statutory. We can not agree with counsel in these views. There is no doubt some uncertainty in the authorities as to the purpose of the application, and this same purpose seemed to bother the judge in the case of *Aydelott* v. *Cincinnati,* 11 C. C., 11; but the courts are quite uniform in holding that an application and publication thereof is jurisdictional to the passage of the final grant.

In *Aydelott* v. *Cincinnati, supra,* that court held that if an application for the route as finally granted, was not made and published prior to the passage of the final grant, such final grant would be void. This case has a very direct bearing upon the grant on Champlain street between Canal and Ontario streets as made in this case, and it was held in that case that if the streets were changed *after* the publication it would be necessary that there should be a new application and a new publication before the making of the final grant, and, if they were not made, the grant would be void.

It seems to be fully within the intent as well as the letter of the statute that some resolution or some proceeding of the council is necessary before bids are taken, in order to advise bidders as to what they are to bid upon, and especially as to a definite route. There would be no basis on which bids could be offered unless some route over definite streets and alleys was established and the conditions and rules and regulations governing the construction and operation of the road were definitely known to those who expect to bid.

The defendants rely upon the case of *Sandfleet* v. *Toledo*, 10 C. C., 460, as authority that an establishing ordinance or resolution is not necessary. But an examination of that case shows that Sandfleet sued as an abutter, and, suing in that capacity, the only question he could raise was the question as to whether the necessary consents had been obtained or not, and he was not concerned with the sufficiency of the application, and the preliminary steps taken by the company and the city were not pertinent questions so far as his rights were involved in the case, and hence that question was not properly before the court. In that case there had been an application for the railroad, and that had been published; there had been competitive bidding, and the railroad had been constructed except one street where it had been enjoined at the suit of an abutter for want of necessary consents on that street. Later, new consents were obtained and a grant made to extend over the street in which the line had not been built for want of consents. The court seemed to regard the publication of an application for the purpose of soliciting bids, as unnecessary because this was an extension and so regarded by the court, and, for that reason, no application was necessary in the case. The court states that it was not the inauguration of a new enterprise; that the street had been once applied for; that the application had been published, and the successful bidder had been ascertained, and the grant had failed for the want of the necessary consents, and that, as to the public, the railroad over the rest of the route was effective as to it.

We do not see how any question could have been raised in that case that would, in any event, bear upon the case before

the court.  The plaintiff was such that the only question which he could raise  would be a want of consents, and we think that case falls entirely short of being authority for the proposition that the city can, after the preliminary steps are all taken and the jurisdictional facts found to exist, grant only one part of the line upon which bids have not been taken separate and apart from the other portions.

The defendants claim that *Sandfleet* v. *Toledo, supra,* is authority for their claim that a street not applied for and not bid upon can be covered by the final grant.  In that case Summit street had been advertised, bid upon, and had been granted. Every requirement of the law for the protection of the public rights had been complied with; nothing had been left undone; no member of the public could have made any complaint; and construction was enjoined on that street at the suit of an abutter for want of necessary consents.  Afterwards the requisite consents were obtained, and that disposed of the only question that the abutter could make, and the question as to whether, when the consent failed on Summit street, the balance of the grant was valid or invalid was never before the court.  The only question as to the validity in that case that was raised, and the only one upon which the court could pass, was as to the validity of the consents and whether the required number had been obtained.  There was no occasion for the court to pass upon the validity or invalidity of the balance of the grant; it was not challenged by any one who could have been sustained in court under such a challenge.

In *Smith* v. *Railway Co.,* 8 N. P., 1, definite routes had been applied for, and application had been published, and all the necessary jurisdictional steps had been taken to a lawful grant as to all questions in which the public was interested, or which the public could raise.  The only question there was raised by an abutting owner, and the only question he could raise or did raise, was as to whether the required number of feet had been obtained; and, after the consents were obtained on these routes, the city made a contract for the balance of the road as already let.

We do not regard these cases cited as any authority upon the question before the court pertaining to Champlain street. In this case there had been no application, no publication as to Champlain street, no proposals were called for, none made; and, with respect to this street, there had been no bidder whatever, and the difference in the facts are so striking that the authorities cited fall far short of establishing the proposition.

We are also referred to *Buckner* v. *Hart*, 52 Fed. Rep., 835. The plaintiff in that case resided on a street which had not been offered for competitive bidding. He objected to the construction of a railroad on that street, and the court held the grant invalid on that street because it had never been put up to competition; but the court was not called upon to say, and did not say, whether this fact rendered the whole ordinance void or not, but did hold the ordinance void on other grounds. The case is authority in the case before the court only so far as it decides that the railroad could not be constructed on the street on which plaintiff lived, because that street had never been put up to competition. And the court further proceeded to hold that the ordinance was void for other reasons. We can not discover that the court intimates whether the ordinance would be void for that reason or not.

It is said that the change from Canal and Michigan streets to Champlain street is so slight a change that the court should not enjoin the carrying out of the contract on that ground alone. It is admitted that if the application, the establishing ordinance and the publication are imperative requirements of the statute, then the city has not complied therewith as to Champlain street; and the comparatively small distance is such, when taking into consideration the thirteen miles, that the court ought not to overturn the granting ordinance on account of that very issue. As we have said before, this entire system is, in contemplation of the parties, but one contract, but one road, and is not separated until application is made before the passage of the granting ordinance to build the thirteen miles. But this question should not be determined on the ground of the insignificance of the deviation, but upon broader principles. The object and purpose of all that the city is doing, and is required to do by the

statute, is to get finally the lowest bidder, or the one who will carry for the lowest rate.

It was known at the time that these bids were made, or soon after, if not at that time, that consents could be had on Canal street, and, for aught this court may know, that fact may have deterred other bidders from putting before the city a bid. If a party knew that he could not get consents to build the road, providing he should be found the lowest bidder, he would not be likely to bid at all; and, if there had been an intimation at the time the bids were received, that the change could be, or would be made, for aught we know, other and lower bids might have been received. And this matter, although claimed to be insignificant, may have been the very thing that kept others from bidding; and only one having bid, can the city change the route without afterwards notifying, or publishing notice, by which others may be permitted to bid after the change is made? We think there is no authority in law for the city doing that, and we can not, in our judgment, overlook the matter on the ground of its insignificance, for, while it is not extensive as to the length of change when compared with the entire line, yet it is sufficient to entirely thwart the very purpose of the statute, and, that being so, the city would have no right to make the change.

We have already said that Sections 2501 and 2502, Revised Statutes, are limitations upon the mode and manner in which the city shall control the streets, and, being such, they must be substantially, at least, adhered to. The statute clearly contemplates that the city is to act when application is made to it, and, when it does act, the steps it is to take are definitely pointed out—as to publication and defining the route, and letting to the lowest bidder, and requiring consents, before the contract is made.

The object and purpose of the statute in requiring publication is, unquestionably, to advise bidders of the nature and character of the road and its location, and of the requirements of the city as to its rules and regulations in governing the construction and running of the same. It is hard to conceive of any other method by which the city might ascertain the lowest bidder and the public be assured that the lowest bidder had

been obtained; and the city adopted this method as to the entire routes described in Section 1 of the establishing ordinance. Those steps were all regular and properly taken for the purpose of establishing a street-car line on that entire system. But, if it was the purpose of the city to let only a portion of the seventy miles or over, after having proceeded regularly to let the whole, and have no bidding arrangement between the bidder and the city as to the remaining portions, but leave them in that condition that if the line is sought to be established upon them, there is no binding contract on the bidder to build them and no binding obligation on the city to allow the builder to build them. This arrangement seems to divorce entirely the thirteen miles let from the entire road and make of it a distinct and separate road. No bids were ever offered or received upon this thirteen miles; none were ever called for; there were no advertisements for bids on it; hence there never was competitive bidding, never a chance offered by the city for competitive bidding on it. For all that appears this may have been the only desirable route on which any one would bid, were the different routes separated. And to obviate the difficulty in which the facts of the case place the city and Hoefgen, it is necessary for the city to contend that application, advertisement and definite description of route are entirely unnecessary; that the only jurisdictional facts to be ascertained by the city before making the contract is that it has obtained the lowest bidder and that the grants are obtained. And the argument of the city is that a start can be made from the point in the proceedings where Hoefgen made application to build the thirteen miles; and, if from that point, the city obtained for that portion-the lowest bid, then the contract is a valid one, and the city seems to conclude that it devolves upon the public, as represented by the plaintiff, to show that the lowest rate of fare has not been obtained. This, we think, is illogical and leads to an erroneous conclusion.

The statute points out the method in which the lowest bidder is to be obtained, and that method is intended for the protection of the public, and when the steps contemplated by the statute have been taken, the public is protected; but if those steps are

omitted, the public, in view of the legislation upon this subject, is not protected.

For all that appears in this case, it may be that much better terms could have been had on this thirteen miles of road than upon the entire road as advertised. It may have been there would have been many bidders for a road of that length that would not bid on a road seventy miles or over in length. Much less capital would be involved, and this, of itself, would increase the number of bidders; and the fact that this thirteen miles was a part of the entire line will not validate the action taken in the contract made by the city, for, as we have said before, the city is under no obligation to let any more of the entire road to Hoefgen, nor is Hoefgen under any legal obligation to build the same.

The thirteen miles has been taken as completely out of the entire line as though it had been separate from the beginning. We are of the opinion that the requirements of the statute were not followed in making the contract in question; and the deviation from the statute is such that the public has a right to require the statute to be followed before a contract shall be left for building the thirteen miles.

It has been said in argument, as to the variation between the establishing ordinance and the granting ordinance, and to the conditions as to paying a part of the income from the road into the city treasury, and provisions for arbitration as to differences between the road and its employes, and as to the right of the city to purchase at a future date, should it receive the power to do the same from the Legislature, and other provisions of like character, are immaterial. It seems to us that some of these provisions of the contract, and some of these variations between the two ordinances, are very material, and such an arrangement does not afford the protection that the public is entitled to have under the statutes. Several of the provisions may be proper in a contract of this character, but, if, as the city claims, the only object and purpose of taking the various steps in obtaining a contract is to ascertain who is the lowest bidder, if that is the *ultimatum,* and the steps to arrive at that are immaterial, then it might, perhaps, be said that the contract is

not so hampered by these provisions that they might not be included under the provisions of the statute allowing the city to prescribe the rules and regulations and the methods of running the road, but this, clearly, would not seem to include a right on the part of the city to determine the method in which differences between employer and employe should be settled, nor would it include the right of the city to place in its terms of arbitration upon the right of the city to purchase. These things are not contemplated in the statute, and the tendency of them is to keep persons from bidding, and, if they do bid, to increase the rate of fare, and we believe them to be contrary to the spirit of the law.

As to the variation between the establishing ordinance and the granting ordinance as to the route to be followed—referring now to those instances where there is a difference other than that of Champlain street—the only grounds on which it is sought to justify the same is that the variation is an immaterial one, being slight, and the variation being as long as the route first prescribed; and, second, on the grounds that no ordinance defining the route was necessary, that it might have been done by any method and at any time changed before the granting ordinance.

The claim as to the variation being a substantial route, as published in the establishing ordinance, is perhaps correct under the evidence in the case; but the claim that a definite route is not necessary is, we think, not well taken. But we do not believe that an ordinance should be held invalid, thus changing the route, unless that change would be such in its nature as to make a difference in the bidding, and, we think, under the evidence in this case, the difference in the bidding would have been slight, if any, and on that ground alone we would not enjoin the carrying out of this contract.

It is contended by the defendants that the plaintiff has no right to bring this action; that he is not sincere in bringing it for the protection of the public, but that he is bringing it for the protection and benefit of the other street-car lines in the city. The only requirement of the statute is fully complied with. There is no intimation in the statute that the party bringing

the action must not have some personal motive and that he may not be influenced by other things than the mere protection of the public; and, in a case tried at Elyria which went to the Supreme Court, and was dealt with there in a manner that the court could not have overlooked this same question, it was ignored by the Supreme Court, though it was made in the case, and the Supreme Court could not have reached the conclusion it did if this ground is well taken in this case. It was not well taken in *that* case, and the party aggrieved was the one who brought the action in behalf of the public. We do not think this ground is well taken.

The judgment is, that the restraining order in this case be made perpetual.

*Wilcox, Collister, Hogan & Parmely, Squire, Sanders & Dempsey* and *N. C. Boyle,* for plaintiff.

*Beacom, Baker, Payer, Gage & Carey* and *Blandin, Rice & Ginn,* for defendants.